# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF WEST VIRGINIA
# ELKINS

**FREDERICK SELLERS,**

        **Plaintiff,**

v.                                        Civil Action No. 2:15cv79
                                                (Judge Bailey)

**UNITED STATES OF AMERICA,**

        **Defendant.**

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

### I. Procedural Background

Plaintiff initiated this pro se case on October 27, 2015, by filing a complaint pursuant to the Federal Tort Claims Act ("FTCA"). ECF No. 1. On October 28, 2015, Plaintiff was granted leave to proceed in forma pauperis [ECF No. 6], and on November 9, 2015, he paid his required initial partial filing fee. ECF No. 6. On March 17, 2016, this Court conducted an initial review of the complaint and determined that summary dismissal was not appropriate. Accordingly, an Order to Answer was entered. ECF No. 23. On May 17, 2016, Defendant filed a Motion to Dismiss, or in the alternative, Motion for Summary Judgment. ECF No. 28. A Roseboro Notice was sent to Plaintiff on May 18, 2016, notifying him of his right and obligation to file a response. ECF No. 30. Plaintiff filed a Response on June 7, 2017, [ECF No. 34] and a Supplement on August 9, 2016. ECF No. 35.

### II. Factual History

Plaintiff is a federal inmate presently confined at FCI Gilmer in Glenville, West

Virginia. On May 27, 2015, Plaintiff filed an administrative tort claim ("SF-95") with the Federal Bureau of Prisons ("BOP") alleging negligence on the part of FCI Gilmer staff for sending him to an outside hospital for an unnecessary hernia repair. Plaintiff requested damages in the amount of three million dollars. ECF No. 29-1 at 5-7. Following an investigation, the BOP denied Plaintiff's claim by letter dated August 26, 2015. The BOP concluded that although there was an erroneous entry made in Plaintiff's medical record regarding an old injury and a hernia, he went to an outside hospital and consulted with a surgeon, who determined that he had a hernia. Further, he signed a consent form for surgery. During surgery, a hernia was found by the outside provider, and the outside provider repaired Plaintiff's hernia. ECF No. 10.

In his complaint, Plaintiff alleges that FCI Gilmer staff sent him to an outside hospital, where he underwent a needless hernia operation because his medical records included records belonging to another inmate. He also claims that after the surgery, his wound became infected as a result of staff negligence in not providing him wound care instructions or physical limitations during his recovery. He seeks six million in compensatory and punitive damages, as well as other relief, including immediate release from custody.

In response, Defendant maintains that Plaintiff's FTCA claim against it must be dismissed on numerous grounds. First, Defendant argues that Plaintiff's FTCA claim as it pertains to his follow-up care and the resulting infections was not properly exhausted. ECF No. 29 at 10-11. Second, Defendant argues that the independent contractor exception to the FTCA applies to Plaintiff's claim regarding his surgery. ECF No. 29 at 16. Third, Defendant argues that Plaintiff's negligence claim against it

2

must be dismissed for failure to comply with the West Virginia Medical Professional Liability Act ("MPLA"). ECF No. 29 at 16-20. Finally, Defendant alleges that Plaintiff's negligence claim against it is without merit. ECF No. 29 at 20-21.

In reply, Plaintiff acknowledges that in his SF-95, he failed to mention the infection that resulted from his "unnecessary" hernia operation, but argues that it is a clear result of the government's initial lapse in good judgment. ECF 34 at 3. In addition, Plaintiff argues that although the surgery may have been performed by an outside contractor, FCI Gilmer's negligence led to the surgery. Id. With respect to Defendant's claim that he failed to comply with the MPLA, Plaintiff argues that his case deals with two noncomplex issues that do not require expert testimony because they are within the common knowledge of lay jurors. In addition Plaintiff advances the doctrine of *res ipsa loquitur*. ECF No. 34 at 4. Finally Plaintiff notes that the Bureau of Prisons has an obligation to provide him with a healthy and safe environment with protection from injury. Plaintiff argues that there was a breakdown within that duty and as a consequence he suffered tremendously. ECF No. 24 at 5. In his supplemental response, Plaintiff points out that Defendant acknowledged that his medical records were scrambled with those of another inmate. ECF No. 35.

### III. Medical Summary[1]

Plaintiff arrived at FCI Gilmer on February 19, 2014. He was seen in Health Services that same day for an intake screening. He was noted to have non-insulin-dependent diabetes, adult onset, and no other issues. He had eyeglasses and alternate institutional shoes (due to diabetes).

---

[1] The information in this section is taken from the Declaration of Eddie Anderson, D.O. ECF No. 29-2 at 2-4. The medical records supporting his declaration are attached as exhibits. ECF No. 29-3 – 29-6.

On February 26, 2014, Dr. Anderson evaluated Plaintiff in the Chronic Care Clinic for his diabetes. Records note that he was compliant with medications, and he reported pain in the soles of his feet with mild decreased sensation distally. Medications were renewed and labs were ordered. The lab results were reviewed in April 2014, and Dr. Anderson recommended insulin and statin[2], as well as an earlier Chronic Care Clinic appointment, if available.

Plaintiff was evaluated in the Chronic Care Clinic on May 27, 2014. At that time, he requested to be tested for H. pylori.[3] Medications were renewed, and the test was ordered. On August 18, 2014, Dr. Savidge, Clinical Director, reviewed Plaintiff's lab results and noted mild-to-moderately elevated glucose, A1C and lipids. The records reflect Plaintiff was pending review and follow-up with his primary care provider.

Physician Assistant ("P.A.") Nolte evaluated Plaintiff in the Chronic Care Clinic on August 20, 2014. He examined Plaintiff and prescribed Losartan in place of Lisinopril.

Plaintiff was evaluated at sick call on October 14, 2014, complaining of a painful rash on his back for the last week. The provider noted that he also needed counseling on his recent lab values, as his diabetes was not controlled, his lipids were now a risk factor for him, and his blood pressure was "terrible." Examination revealed a dermatome from left back to center chest in the T4-5 region, and a healing discrete rash of scaling, scabbed, 1-2 mm lesions along the linear line of the dermatome.

---

[2] Statins are a class of drugs often prescribed by doctors to help low-cholesterol levels in the blood.

[3] H. pylori, or Helicobacter pylori, are spiral -shaped bacteria. H. Pylori is considered to be contagious and is passed from person-to-person by saliva, fecal contamination in food or water and for hygiene practices. Although many infected individuals have no symptoms, other infective individuals may have occasional episodes of belching, bloating, nausea with vomiting, and abdominal discomfort.

Under the abdomen and inspection portion of the note, it stated that the patient has "two hernias on either side of the scar." It also stated that the scar is a "result of stabbing injury," and "pt. denies need for temporary ostomy." New medications were ordered including Acyclovir and carbamazepine. A general surgery consultation request was entered for evaluation and treatment plan for ventral incisional hernias.

Plaintiff was evaluated in Chronic Care Clinic on December 4, 2014. He claimed compliance with medications and denied any problems. The provider noted that he had soft shoes for neuropathy, but did not meet the criteria for continued soft shoes. The provider noted that he started taking diabetes medications about two months earlier and that nothing would be changed until the next labs. Plaintiff was advised that his [oral] meds were "maxed out and insulin was next."

On January 27, 2015, plaintiff underwent surgery to repair a ventral hernia at St. Joseph's Hospital in Buckhannon, West Virginia. Plaintiff signed forms consenting to the treatment, surgery, and anesthesia. He returned to the institution the same day, where he was evaluated in Health Services upon intake. He had no complaints, and stated "I am fine, I didn't even know I had a hernia." The nurse noted that he had a dressing under an abdominal binder over the umbilicus area with no signs of new bleeding. He was provided instructions for no lifting over 10 pounds and wearing an abdominal binder for three months. He was advised that he could shower and return to work in two weeks. The nurse also noted the old dressing would be removed 24 hours post op. The nurse also issued an idle, or Medical Duty Status form, placing Plaintiff on lifting restriction (nothing over 10 pounds), and a work/school idle to return to work in two weeks. He was permitted to have an abdominal binder for three

months.

On February 9, 2015, Plaintiff reported to sick call stating that his incision was infected. The provider noted umbilicus with purulent discharge, no erythema. Cultures were taken and antibiotics prescribed. On February 18, 2015, based upon the results of the culture, another medication was added for Plaintiff's infection based on the results of the culture.

Plaintiff was examined by a nurse on February 20, 2015, for post-operative evaluation, and the clinical notes indicate a small amount of serosanguinous drainage was observed, with no redness, swelling, or fever. On February 23, 2015, Plaintiff was evaluated in Chronic Care Clinic. Dr. Anderson noted that his surgical wound was well-approximated in healing, but with an area of 0.5 cm granulation tissue and a small amount of a clear discharge. There was no swelling, odor, or redness. Dr. Anderson wrote a general surgery consultation request for the wound granuloma, as he did not think that it would resolve on its own. Plaintiff was also issued gauze sponges and tape. Dr. Anderson also examined Plaintiff for his diabetes, diabetic neuropathy and hypertension. He refilled Plaintiff's medications and ordered labs. On May 11, 2015, Plaintiff signed a Medical Treatment Refusal form declining to go for outside treatment for his wound granuloma, as requested by Dr. Anderson.

Plaintiff's next Chronic Care Clinic appointment was June 30, 2015. The provider reviewed his lab results and advised him that if he showed no improvement at the next chronic care visit, he would need to be placed on insulin. Plaintiff reported to sick call on August 13, 2015, for urinary problems. The issues were deemed likely related to his poor control of his diabetes. He was advised to increase his water

consumption, exercise, and start counting and limiting starches. At his October 9, 2015, Chronic Care Clinic appointment, the provider noted that he claimed compliance with medications and his A1C had improved, as well as his lipids. On January 29, 2016, Plaintiff was evaluated in Chronic Care Clinic. He reported compliance with medications and understood that he needed to make some significant changes to avoid adjustments in his medications.

As of May 17, 2016, when Defendant filed his motion to dismiss or for summary judgment, Plaintiff continued to be followed in Chronic Care Clinic at FCI Gilmer. There had been no mention of the hernia surgery since Plaintiff's refusal of the wound granuloma treatment consultation in May 2015.

## IV. Standard of Review

### A. Motion to Dismiss

In ruling on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded material factual allegations. Advanced Health-Care Services, Inc., v. Radford Community Hosp., 910 F.2d 139, 143 (4th Cir. 1990). Moreover, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear as a matter of law that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint. Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

When a motion to dismiss pursuant to Rule 12(b)(6) is accompanied by affidavits, exhibits and other documents to be considered by the Court, the motion will be

construed as a motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

**B.  Motion for Summary Judgment**

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In Celotex, the Supreme Court held that the moving party bears the initial burden of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact. Celotex at 323. Once "the moving party has carried its burden under Rule 56, the opponent must do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). The nonmoving party must present specific facts showing the existence of a genuine issue for trial. Id. This means that the "party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. The "mere existence of a scintilla of evidence" favoring the non-moving party will not prevent the entry of summary judgment. Id. at 248. Summary judgment is proper only "[w]here the record

8

taken as a whole could not lead a rational trier of fact to find for the nonmoving party." Matsushita, at 587 (citation omitted).

Plaintiff is proceeding *pro se* and therefore, the Court is required to liberally construe his pleadings. Estelle v. Gamble, 429 U.S. 97 (1976); Haines v. Kerner, 404 U.S. 519 (1972) (*per curiam*); Loe v. Armistead, 582 F.2d 1291 (4th Cir. 1978); Gordon v. Leake, 574 Fed 2nd 1147 (4th Cir. 1978). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys, even under this less stringent standard, a *pro se* complaint is still subject to dismissal. Haines, 404 U.S. at 520 – 21. The mandated liberal construction means only that of the court can reasonably read the pleadings to state a valid claim on which Plaintiff could prevail, it should do so. Barnett v. Hargett, 174 Fed 3rd 1128 (10th Cir. 1999). However, a court may not construct plaintiff's legal arguments for him. Small v. Endicott, 998 F.2d 411 (7th Cir. 1993). Nor should a court "conjure up questions never squarely presented." Beaudett v. City of Hampton, 775 F.2d 1274 (4th Cir. 1985).

## V. Analysis

As previously noted, Plaintiff presents two claims for relief under the FTCA. First he alleges that he was subjected to unnecessary surgery because another inmate's records were incorporated into his, leading to surgery for a hernia which he did not have.

There is no question that the electronic medical records from Plaintiff's clinical encounter with Johanna Lehmann, PA-C, dated October 14 2014, somehow included notes that did not pertain to Plaintiff. Specifically, with respect to the examination of his

9

abdomen, the notes indicate that he was observed to have an incisional hernia[4]. More particularly, the records indicate that Plaintiff "has 2 hernias on either side of a scar. Superiorly on the left – 2.5 cm; on the right side is a slightly larger one – 3-4cm scar is result of stabbing injury, pt. denied need for temporary ostomy." ECF No. 29-4 at 43. Although not specifically admitting that Plaintiff was misdiagnosed with two incisional hernias, the BOP acknowledges that there was an error in his medical records regarding a previous injury.[5] ECF No. 29-1 at 10.

On January 27, 2015, Plaintiff arrived at St. Joseph's Hospital and signed an informed consent to undergo surgery to repair ventral[6]/incisional hernias. The operative report, prepared by Salvatore Lanasa, MD, indicates that:

> The [Plaintiff] under general anesthesia was prepped and draped in a sterile manner. There was a herniation on the midline just above the umbilicus for about 2 inches and included the umbilicus as well. What we did was an incision through the skin and subcutaneous tissue dissecting the sac. This seemed to contain just prepertioneal fat. The sac, without entering the abdominal cavity, was dissected and pushed down into the abdominal cavity. After that, repair of the hernia defect was done by approximating the fascial edges with running suture of Prolene. Marcaine was injected for postoperative pain control and the skin was approximated with 4-0 Vicryl. Dressing was applied and the procedure was completed.

ECF No. 29-6 at 10.

Therefore, although Plaintiff did not have two incisional hernias, he did have an umbilical hernia which was repaired by Dr. Lanasa. Therefore, any "negligence" on the part of the medical staff at FCI Gilmer in maintaining his medical records did not result

---

[4] An incisional hernia is a hernia that occurs through a previously made incision in the wall, i.e., the scar left from a previous surgical operation.

[5] Plaintiff alleges that he has never been stabbed, and Defendant does not dispute that allegation. Accordingly, while it is unclear to this Court how the same occurred, it is obvious that the portion of the October 14, 2014, clinical encounter which references a stabbing injury is clearly erroneous and must pertain to another inmate.

[6] Ventral refers to the front/belly of an organism.

in Plaintiff undergoing unnecessary surgery for a nonexistent hernia, and accordingly, Plaintiff is not entitled to relief on this claim. Moreover, as explained below, even if Plaintiff's surgery had been unnecessary, he is barred from recovery under the FTCA.

The FTCA is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States. The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA. Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code. 28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680.

Under the FTCA, actions for damages against the United States may be asserted "for injury or loss of property, or personal injury or death caused **by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment**, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b)(1) (emphasis added). The Act defines Government employees to include officers and employees of any federal agency but excludes any contractor with the United States. 28 U.S.C. § 2671. Because the United States can be sued only to the extent that it has waived its immunity, due regard must be given to the exceptions, including the contractor exception, to such waiver. See Dalehite, 346 U.S. at 30-31.

A critical element in distinguishing an agency from a contractor is the power of the Federal Government "to control the detailed physical performance of the contractor."

Logue v. United States, 412 U.S. 521, 528 (1973). As more specifically explained by the Fourth Circuit, "[t]he test for whether an alleged tortfeasor is an employee rather than an independent contractor of the United States is whether the government exercises day-to-day control over the performance of the work under the contract." Berkman v. United States, 957 F.2d 108, 113 (4th Cir. 1992).

In this case, Plaintiff's hernia surgery was performed by Dr. Lanasa, a community surgeon, at St. Joseph's Hospital which is not operated by the BOP. Plaintiff provides no evidence that the government exercises any control over the daily work of St. Joseph's Hospital or Dr. Lanasa. In fact, it is pertinent to note that Plaintiff was sent to that facility for surgical repair of two incisional ventral hernias. Upon examination, Dr. Lanasa instead found one ventral hernia. Plaintiff signed both an Informed Consent for Surgery [ECF No. 29-6 at 1-7] and a Consent and Authorization for Treatment. Id. at 8. Dr. Lanasa's preoperative diagnosis was ventral hernia as was his postoperative diagnosis. Id. at 10. Accordingly, not only is there no evidence that the government exercises control over the daily work of St. Joseph's Hospital or Dr. Lanasa, this sequence of events establishes the contrary. Dr. Lanasa, without any prior approval from the BOP, formed an independent diagnosis and performed surgery to correct the same. Therefore, even if Plaintiff's hernia surgery was unnecessary, under the contractor exception, the United States is not responsible for any alleged negligent act or omission of Dr. Lanasa in performing the surgery.

Plaintiff's second claim under the FTCA is that his surgical wound became infected due to the negligence of the BOP medical staff at FCI Gilmer. Dismissal of this claim is also warranted.

Pursuant to the provisions of the FTCA, the administrative process must be fully exhausted before FTCA claims may be brought in an action in federal court. 28 U.S.C. § 2675(a). Administrative exhaustion under the FTCA requires an inmate to submit written notification of the incident-accompanied by a sum certain claim for monetary damages to the federal agency responsible for the activities giving rise to the claim. See 28 C.F.R. § 14.2 (a) and (b)(1). The inmate may file an FTCA suit in federal court only after the agency denies the inmate's claim, and must do so within six months of the mailing of the denial. 28 C.F.R. § 14.9. An administrative tort claim is statutorily presumed denied if six months pass without action on a properly filed administrative claim. 28 U.S.C. § 2675(a). The failure of a plaintiff to exhaust his or her administrative tort claim prior to filing suit deprives the court of subject matter jurisdiction. See McNeil v. United States, 508 U.S. 106, 113 (1993) (affirming dismissal where *pro se* plaintiff failed to strictly adhere to the FTCA's procedural and timing requirements).

Although Plaintiff filed a SF-95 with the agency which was denied on August 26, 2015, that claim related only to his hernia surgery and made absolutely no mention of his follow-up care or any resulting infection. ECF No. 29-1 at 5-8. Therefore, Plaintiff has not exhausted his claim to the BOP regarding his follow-up care for an infection which developed after the surgery, and it must be dismissed for lack of subject matter jurisdiction. See Stackhouse v. United States, Civil No. 09-839, 2011 WL 820885 *11 (D. Minn. Feb. 11, 2011) (plaintiff failed to exhaust claim for negligent medical care following surgery where administrative FTCA claim only addressed period of` time up to and including surgery and failed to address care after surgery). Furthermore, even if Plaintiff had exhausted this claim, it would still be subject to dismissal.

13

The FTCA waives the federal government's traditional immunity from suit for claims based on the negligence of its employees. 28 U.S.C. §1346(b)(1). "The statute permits the United States to be held liable in tort in the same respect as a private person would be liable under the law of the place where the act occurred." Medina v. United States, 259 F.3d 220, 223 (4th Cir. 2001). Because all of the alleged negligent acts occurred in West Virginia, the substantive law of West Virginia governs this case.

To establish a medical negligence claim in West Virginia, the plaintiff must prove:

(a) the health care provider failed to exercise that degree of care, skill, and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and (b) such failure was a proximate cause of the injury or death.

W.Va. Code §55-7B-3. When a medical negligence claim involves an assessment of whether or not the plaintiff was properly diagnosed and treated and/or whether the health care provider was the proximate cause of the plaintiff's injuries, expert testimony is required. Banfi v. American Hospital for Rehabilitation, 529 S.E.2d 600, 605-606 (2000).

Additionally, under the West Virginia MPLA, certain requirements must be met before a health care provider may be sued. W.Va. Code §55-7B-6. This section provides in pertinent part:

**§ 55-7B-6. Prerequisites for filing an action against a health care provider; procedures; sanctions.**

(a) Notwithstanding any other provision of this code, no person may file a medical professional liability action against any health care provider without complying with the provisions of this section.

(b) At least thirty days prior to the filing of a medical professional liability action against a health care provider, the claimant shall serve by certified mail, return receipt requested, a notice of claim on each health care

provider the claimant will join in litigation. The notice of claim shall include a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit. The screening certificate of merit shall be executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence and shall state with particularity: (1) The expert's familiarity with the applicable standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death. A separate screening certificate of merit must be provided for each health care provider against whom a claim is asserted. The person signing the screening certificate of merit shall have no financial interest in the underlying claim, but may participate as an expert witness in any judicial proceeding. Nothing in this subsection may be construed to limit the application of rule 15 of the rules of civil procedure.

"[T]he purposes of requiring a pre-suit notice of claim and screening certificate of merit are (1) to prevent the making and filing of frivolous medical malpractice claims and lawsuits; and (2) to promote the pre-suit resolution of non-frivolous medical malpractice claims." Hinchman v. Gillette, 618 S.E.2d 387, 394 (W.Va. 2005). This Court previously held that compliance with W.Va. Code §55-7B-6 is mandatory prior to filing suit in federal court. See Stanley v. United States, 321 F.Supp.2d 805, 806-807 (N.D. W.Va. 2004).[7]

As previously noted, Plaintiff alleges that medical staff at FCI Gilmer failed to provide proper follow-up care following surgery which resulted in an infection. Defendant contends that this claim must be dismissed because Plaintiff did not adhere to the requirements of W.Va. Code § 55-7B-6. In response, relying on Johnson v.

---

[7] In Stanley, the plaintiff brought suit against the United States alleging that the United States, acting through its employee healthcare providers, was negligent and deviated from the "standards of medical care" causing him injury.

United States, 394 F. Supp.2d 854 (S.D.W.Va. 2005)[8], Plaintiff argues that his SF-95 was sufficient to meet the pre-filing requirements of the MPLA. More specifically, Plaintiff alleges that he filed his SF-95 form in which he stated the theory of liability upon which his cause of actions was based as well as the health care provider who was responsible for the negligent act. Accordingly, Plaintiff contends that his SF-95 meets the goal of alerting the United States of the precise nature of his claim. ECF No. 34 at 2.

Under West Virginia law, "[i]t is the general rules that in medical malpractice cases, negligence or want of professional skill can be proved only by expert witnesses." Syllabus Point 2, Roberts v. Gale, 149 W.Va. 166, 139 S.E.2d 272 (1964). Expert testimony, however, is not required "where the lack of care or want of skill is so gross as to be apparent, or the alleged breach relates to noncomplex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience. Farley v. Shook, 218 W.Va. 680, 629 S.E.2d 739 (2006). The MPLA provides as follows concerning claims "based upon a well-established legal theory of liability":

> Notwithstanding any provision of this code, if a claimant or his or her counsel, believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care, the claimant or his or her counsel, shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit.

West Virginia Code § 55-7B-6(c).

In Johnson, the Court held that plaintiff's statement on his administrative claim form alleging improper surgical implantation of a prosthesis satisfied the provisions of

---

[8] Plaintiff either mistakenly or inadvertently indicates that Johnson was decided by the Fourth Circuit.

the MPLA permitting the filing of a claim without submitting a certificate of merit. Id. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon "implanted the too large Prosthesis backward causing diminished bloodflow and subsequent Necrosis and infection." Johnson, 394 F.Supp. at 858.

Unlike the facts in Johnson, Plaintiff does not allege lack of care so gross as to be apparent or a breach that relates to non-complex matters of diagnosis and treatment. See O'Neil v. United States, 2008 WL 906470 (S.D.W.Va. Mar. 31, 2008) (finding that plaintiff was not excused from filing a screening certificate of merit because the treatment and diagnosis of Graves disease, hyperthyroidism, congestive heart failure and cardiomyopathy, are not within the understanding of lay jurors by resort to common knowledge and experience); also see Giambalvo v. United States, 2012 WL 984277 *4 (N.D.W.Va. Mar. 22, 2012) (finding that Johnson "is a rare exception to the general rule that in medical malpractice cases negligence or want of professional skill can be proved only by expert witnesses'.").

In the instance case, it appears that medical staff at FCI Gilmer evaluated and provided treatment for Plaintiff's surgical wound such as instructing him not to lift over ten pounds and wearing an abdominal binder for three months. He was also issued an idle, or Medical Duty Status form, placing Plaintiff on lifting restriction (nothing over ten pounds) and a work/school idle to return to work in two weeks. When Plaintiff reported to sick call two weeks later stating that his incision was infected, cultures were taken and antibiotics prescribed. Moreover, based on the results of the culture, another

medication was added. Finally, although Dr. Anderson wrote a general surgery consultation request for the wound granuloma, Plaintiff signed a Medical Treatment Refusal form declining outside facility treatment for wound granulation. ECF No. 29-4 at 15. The undersigned finds that the methods of prevention and proper treatment options for Plaintiff's wound infection are not within the understanding of lay jurors by resort to common knowledge and experience, and expert testimony is necessary to support any finding that the medical treatment provide at FCI Gilmer post-surgery fell below the standard of care. Accordingly, Plaintiff is not excused from filing a screening certificate of merit pursuant to West Virginia Code § 55–7B–6(c).

For the foregoing reasons, the undersigned **RECOMMENDS** that the Government's Motion [ECF No. 28] to Dismiss or for Summary Judgment be **GRANTED**; The undersigned further **RECOMMENDS** Plaintiff's Complaint be **DISMISSED WITH PREJUDICE** under the independent contractor exception as it related to his claim for unnecessary surgery and be **DISMISSED WITHOUT PREJUDICE** for failure to exhaust an administrative tort claim and comply with the MPLA as it relates to his follow-up care and infection following surgery.

Within **fourteen (14) days** after being served with a copy of this Report and Recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objections are made and the basis for such objections. A copy of any objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1);

Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as shown on the docket, and to counsel of record by electronic means.

DATED: December 19, 2016

*/s Robert W. Trumble*
ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE